Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and the sign of the court. Good morning. Thank you, Ms. Geddes. We are delighted to have you all here on this Friday morning. Judge Rosenbaum and I have enjoyed being with Judge Tallman this week. He's in Idaho and it took a whole week of argument. Now, oftentimes our visiting judges only take a couple of days, so we're very grateful to you for the heavy lift, Judge Tallman. Well, you're more than welcome and thank you for your hospitality. Well, we would have much preferred to have done it in person, but Judge Rosenbaum and I are going to come see you in Idaho, I think. I hope so. We'll leave the light on for you. So I know we have counsel ready to go. I just wanted to remind you that we have allotted the first two minutes of your argument as uninterrupted time. And then after the two minutes of the last, we'll start in with our questions. Ms. Geddes is going to help us out by giving you a two-minute warning when your time is about to expire and then she will tell us when your time has expired. So I always want to check with Ms. Geddes. Anything else I need to share with counsel before we get underway? No, Judge. We're great. All right. Thanks so much. Then I'll call the case of the United States of America v. John Matthew Gaydon, Jr. Ms. Howard? Thank you, Your Honor. This is Katherine Howard on behalf of Dr. John Gaydon and may it please the Court. The main issue in this case is about protecting doctor-patient privacy and digital aid. Fourth Amendment does not permit law enforcement to enter a doctor's office unannounced and without a warrant or even notifying the doctor, search and seize his prescribing records just to, quote, determine what to look for in a criminal investigation. But that is what happened here, except instead of rummaging through a filing cabinet, the DEA took the comprehensive record of Dr. Gaydon's prescribing decisions from the digital PDMP database. This warrantless search has violated Dr. Gaydon's Fourth Amendment rights and requires suppression of the PDMP data and its poisonous fruits. There are four points I'd like to emphasize today. First, Dr. Gaydon had a reasonable expectation of privacy in this comprehensive record of his prescriptions, a privacy interest that is essential to longstanding expectations regarding doctor-patient relationships. Law enforcement access to the PDMP, which contains aggregated, analyzed prescription data that with the click of a button can be manipulated to generate trends and draw inferences from those trends about a doctor's patients and his practice, contravenes his expectation of privacy because prior to the digital age, law enforcement could not or would not have obtained this breadth and depth of information. Second, the so-called third-party doctrine should not be extended to these inherently sensitive records, which were not voluntarily provided to the PDMP. Third, the regulation of controlled substances does not justify this warrantless search either. The Controlled Substances Act specifically exempts physicians like Dr. Gaydon from keeping records of their prescriptions for review, and searching the PDMP is not the equivalent of obtaining more limited records from individual pharmacies. In any event, the government's argument would extend the regulated industry exception much farther than the doctrine and its logic permits. And fourth, because the record is clear that law enforcement relied on the PDMP to obtain the federal search warrant, the patient files used at trial are fruit of the poisonous tree and must be suppressed. Turning to Dr. Gaydon's reasonable expectation of privacy, it's important to note the issue here is not one prescription or a handful of them, but a comprehensive collection that reveals Dr. Gaydon's decision-making over time and across patients. Go ahead. That's okay, Judge Talman. You go first today. Judge Talman here. Am I correct that Dr. Gaydon had voluntarily subscribed to participate in the Florida PDMP computerized tracking program? He did voluntarily subscribe to become an authorized user of that in October 2011 when it first went online. And wasn't the system set up in order to address the abuse of prescription medications by addicts? Wasn't that the whole reason so that people couldn't go around the state and doctor shop and get excessive amounts of controlled substances? Yes, Your Honor, and to that extent, the PDMP was set up for use by doctors, to Your Honor's point, to aid them in their treatment of patients. And that is what Dr. Gaydon signed up for when he signed up for the PDMP. And to be very clear, his voluntary participation had no bearing on whether his prescription records had been collected and added without his knowledge or consent because that was going to happen regardless of whether he volunteered for the program. But the pharmacies... Go ahead. The pharmacies also participated, did they not, in submitting data on prescriptions that they filled? The pharmacies did. The pharmacies were required to submit prescriptions that they filled. And I think to that point, it's important to understand why when the PDMP collects comprehensively the prescriptions from all pharmacies across the state, that's different than, you know, law enforcement maybe through traditional means of investigation going to those individual pharmacies. Because the PDMP, you know, requires all pharmacies to upload that information. It digitizes it. It analyzes it. It aggregates it. And at that point, it's much more meaningful as a law enforcement investigation tool than simply the sum of its parts. We know that because that's what happened here in Dr. Gaydon's case because Agent Sela was able to run and pull all of Dr. Gaydon's prescriptions. And it was so much information, you know, she said she just wanted to determine what to look for at first. And she had to manipulate that data. She had to sort it because it wasn't... It was so much information and she had to sort it by prescription type, by amount. This was something that would not be possible without this sort of collection, aggregation, digitization of the records. And she was able to draw trends about Dr. Gaydon's prescription practice and make inference from those trends. And that's what led to, you know, her ability to then... But in view of the fact that he voluntarily signed up and that it includes information from several third parties, what is the basis for his position that he had a reasonable expectation of privacy in this information, especially since under the law, the law enforcement folks could go ahead and obtain access anyway? I mean, what is the basis for his reasonable expectation of privacy? Absolutely. So I think there's a couple of points there, Judge Rosenbaum. As an initial matter, I want to be clear that Dr. Gaydon's decision to participate in the PDMP happened right at the end of his practice because the PDMP did not go online until the last few weeks that he was practicing medicine. He signed up for it to use it for its intended medical purpose, not to voluntarily turn over all of his prescribing information. And there's simply nothing in the record that indicates that when he was making these prescriptions over the course of two years before the PDMP was even online or available, that he was consenting to that collection and data. How do you distinguish this from Miller, though? I mean, in Miller, people were going ahead and using banks for purposes of accomplishing their financial transactions. They weren't doing it so that their financial transactions could be monitored. But the Supreme Court said it doesn't really matter. Once you show it to the bank, you don't have a reasonable expectation of privacy in it. So how do you come up with a reasonable expectation of privacy here and distinguish Miller? Absolutely. I think there are a couple of ways, Your Honor, because we know that the third-party doctrine doesn't apply automatically. It depends on the facts of each case. And I think that the prescription records in the PDMP are much more inherently private and sensitive than the bank records in Miller. It's important to note, these aren't just opioids, but all controlled substances. Except that, I'm sorry to interrupt, but maybe the health care records argument might have some substance to it, except that the records that are being taken are the records that pertain to the health of the patient. And so, you know, Dr. Gaydon didn't really have – it's not Dr. Gaydon's interest there. Do you understand what I'm saying? I certainly understand your point, and I do agree there's a serious privacy threat in the PDMP as it comes to patients and their private health information. But I do think Dr. Gaydon had an expectation of privacy in the collective decision-making that he made over time and across patients. There was no one patient or handful of patients or one pharmacy or handful of pharmacies that had that collective information about his private practice. That was known only to him, and that information, our medical system relies on his expectation of privacy in those records. How? Because the physician needs his patients to be truthful and honest with him so that he can treat them, and he has a corresponding duty to treat those patients, and that includes prescribing necessary medication. And if law enforcement can now, with the click of a button, without a warrant, for purposes of criminal investigation, look through a comprehensive, you know, overall record of a doctor's prescribing decisions, and it can use that to, as they did here, you know, draw trends and patterns about his prescribing practice and about his patients, it could make that doctor reluctant to prescribe medication, and it could make his patients reluctant to give truthful information. And that goes to, you know, his job and his duty as a physician. But he has taken an oath, and he has been licensed, and it's part of his job to help the patient. So are you making the argument that he would not comply with his oath and not do what his license required simply because he was afraid that the government might find out what he was prescribing to his patients as far as this database goes? No, Your Honor, but I do think that there's a significant chilling effect, and it is a fear. I think anyone would be afraid if we knew that the government was constantly looking over our shoulder, not just for public health purposes and regulatory purposes, which, of course, Dr. Gaten was subject to, and those did run their course in this case, but for specific purposes of a criminal investigation, and that those records could be, again, you know, compiled, analyzed, sorted in a way that, you know, inferences can be made, justified or not, but that does have a chilling effect. And, again, it's not just to Dr. Gaten and his oath that he took, but also to the fear that his patients will start to withhold information or not seek treatment, and that, too, interferes with his practice of medication because he can't fulfill his job if that's the case. Ms. Howard, I'm a little bit puzzled by your position based on your representation that Dr. Gaten didn't even begin voluntarily submitting information to the database until a few weeks before he ceased practicing medicine entirely. That would mean that the bulk of the records that were in the database at that point were compiled as a result of the pharmacies submitting the information about filling the prescriptions where the patients had voluntarily given the pharmacy their prescription from Dr. Gaten. Isn't that a fact? That's correct, and I want to be very clear, Your Honor. Thank you. All of Dr. Gaten's prescription records were added as required by law by the pharmacist. Dr. Gaten did not voluntarily provide any information. The problem with your argument is that if he wasn't even participating in the system by supplying his own records, then he's trying to assert a privacy interest that perhaps would be owned by the patients, but they're the ones who gave the prescriptions to the pharmacies who filled them, and then the pharmacies reported the fact that they filled the prescription. I understand that, Your Honor. My point is that Dr. Gaten was the only one who had the overall comprehensive record of his prescriptions. No patient volunteered on Dr. Gaten's behalf to put together their prescription records plus everyone else's. They may have weighed it as to their own individual privacy interest, but Dr. Gaten has a special privacy interest that is not as to one prescription or a handful of prescriptions or even one pharmacy's prescriptions, but is to the overall record, an overall comprehensive record of his prescribing prescriptions. I see that I am out of time. If there are any other questions, we would ask this Court to vacate Dr. Gaten's conviction and sentence. You deserve some time for rebuttal, and we'll give you that, Ms. Howard. Now we'll hear from Ms. McNamara. Good morning, and may it please the Court. This is Linda Julen McNamara for the United States. The fact that a patient's own medical records are inherently private doesn't establish that Dr. Gaten, a physician, had a reasonable expectation of privacy in the information conveyed by pharmacies to a state database relating to the prescriptions that he had written and given to his patients to fill. As an initial matter, I have found no appellate court opinions, and he's cited none, holding that a doctor has any Fourth Amendment interest in the prescriptions that he writes and distributes to his patients, whether individually or amassed in a database. After all, once the physician hands a slip of paper to his patient or electronically conveys that information to a pharmacy, he has no say over what the patient does with it, tells his family and friends about it, discusses it on an Internet forum, or reports it to a DEA agent who's waiting in the parking lot outside the doctor's office. He also has no say over what the pharmacy does with it, including reporting it to a state database or law enforcement officer. And when Gaten chose to engage in a medical practice that focused on the prescription of highly regulated, and when he registered with the DEA for authorization to prescribe those substances, he knew that his prescribing information would be subject to close scrutiny because of the state's interest in the prevention of the abuse of controlled substances. That's the very purpose of the Prescription Drug Monitoring Program, the sharing of prescribing information among those involved in the process to prevent the misuse of dangerous prescription drugs. The statutes governing the program when he was practicing, Florida Statute Section 893.055 and .0551, specifically made information regarding the prescribing of controlled substances available to various persons and entities, including doctors, pharmacies, health care regulatory boards, and most importantly for our purposes, law enforcement agencies during active investigations of potential criminal activity regarding controlled substances. A good summary of that is in Docket Entry 167-3, which is a fact sheet about how law enforcement agents can use the PDMP. The versions of the applicable statutes that were in effect at the time he joined the PDMP are also attached to Docket 167 as exhibits. Under these circumstances, Gaten had no expectation of privacy in the information that pharmacies conveyed to the state and that the state amassed in the PDMP. That's very similar to the situation in the recent marijuana dispensary case standing akimbo that we cited in our Supplemental Authority Letter. That case involves records maintained by the Colorado Department of Revenue's Marijuana Enforcement Division, which is a state entity for regulating licensed marijuana sales. The Tenth Circuit held that the dispensaries have no reasonable expectation of privacy in the division's database because when the dispensaries chose to operate a marijuana business in Colorado, they agreed to provide certain information to the division. And once the information was in the division's database, it belonged to the enforcement division, and the dispensary had no expectation of privacy in it. It didn't matter that Colorado law deemed that information to be private because the law also specified that the information in the system could be used for the investigation and enforcement of any federal or state law. And the same is true here. Although the Florida statute provided that the information of a healthcare practitioner contained in the PDMP database is confidential, it also required the Department of Health to disclose that information to various entities, including a law enforcement agency that has initiated an active investigation involving a violation of the prescription drug laws. So Gaten had no reasonable expectation of privacy in that database, and he suffered no Fourth Amendment violation when the DEA accessed it. I'd also like to point out that although Gaten contends in his brief that he suffered a Fourth Amendment violation, he does not specify the evidence that came in a trial that the government obtained as a result of that supposed violation.  The evidence from the trial, the patient records, was gathered during the execution of the federal search warrant. So that's true. I'm sorry, this is Robin Rose. It's true that he doesn't specify what from the trial, but isn't he making the argument that the search warrant itself, any evidence from the search warrant itself and any fruits that came from that should be suppressed because the search warrant was obtained in part on the PDMP records? I think that's what his argument is. Yes, Judge Rosenbaum, I understand that. But the district court here also determined that the good faith exception to the exclusionary rule applied to the evidence that was obtained pursuant to the warrant. And he doesn't discuss at all in his brief what would be left in the federal search warrant after excising the information that he can test. So we don't think he's made a sufficient challenge to the good faith exception ruling. He certainly hasn't discussed the information that would have come in anyway. And I can tell you what would have come in and what the district court noted would have come in was interviews of Gaydon's former employees establishing that his practice had become an all-cash business around 2009. Those employees also said that between 2009 and 2011, Gaydon had prescribed large quantities of oxycodone to each patient each month, that is 240 to 360 high-dose tablets to each patient. They said that Gaydon had seen 35 to 40 patients each day with the appointment scheduled at 10-minute intervals and that he typically had spent approximately one to two minutes with each patient. This is all in the warrant affidavit completely unrelated to the PDMP information. The affidavit also said that all this had been conferred by surveillance. The affidavit was also based on interviews of patients who said they were addicted to painkillers, that Gaydon had never performed a physical exam or completed a medical history or discussed alternative treatments. Some said they had received prescriptions without even coming into the office. One of the patients had provided his text message logs, which showed that Gaydon's office manager had met the patient outside the practice after business hours and had given the patient and his wife prescriptions in exchange for a fee. The affidavit was also based on medical examiner records showing that three of Gaydon's patients had died of overdoses of prescription medicine. Gaydon discusses none of this in his brief. So even if he had shown a Fourth Amendment violation, he's not established any basis for this court to reject the district court's good faith exception ruling. Ms. McNamara, I'm always thinking about, you know, somebody's got to write the opinion in this case. I just want to be sure I understand the dynamic. On the ex post facto claim, am I correct that Dr. Reisman based his testimony on the amended court administrative code? He did discuss the amended administrative code. I mean, he did assume that was in effect, in other words. This is maybe a better way for me to ask it. I mean, he assumed that was an assumption in his opinion. Am I wrong about that? I'm not sure that that's a fair interpretation of his testimony. Just tell me how you view it. He was asked regarding his opinion with respect to Gaydon's treatment of patients between 2009 and 2011. And he testified, what I want to convey to you this afternoon is the practice that we were seeing in 2009 to 2011 was in no way, shape, or form adhering to the standards of care at the time. And in discussing his practice in terms of the standard of care, Dr. Reisman testified these were the standards in 2009 to 2011. I'm sorry. So it's the government's position that whether the conduct that Dr. Reisman was evaluating was before October 10 or after October 2010, it was illegal. It was not for legitimate medical purposes. Is that? Absolutely. Absolutely. Absolutely. And what changed with respect to... I'm sorry. Go ahead. No, go ahead. What changed was that post-October 2010, the post-October 2010 version of the pertinent foreign administrative code, which is in the record as a government exhibit 38, basically changed the word should to shall in some places. So, for example, where it previously said the medical record should document the nature and intensity of the pain, it now says the medical record shall document the nature and intensity of the pain. And Dr. Reisfeld plainly saw no substantive difference in the standard relating to the appropriate course of professional practice because he said that what he was testifying to was what the standard of care had been since 1998. And I should also point out that there were many important things that didn't change at all. For example, the standard said before and continues to say that the board will consider prescribing controlled substances for pain to be for a legitimate medical purpose if based on accepted scientific knowledge of the treatment of pain or if based on sound clinical ground. All such prescribing must be based on clear documentation of unrelieved pain and in compliance with applicable state or federal law. I mean, that's just one thing that didn't change. There were other things with respect to the maintenance of records and such that the wording didn't even change. We don't think that the wording of should to shall changed the appropriate standard of care, but there were many things that didn't change at all in any event. Okay, that's helpful. And I had another kind of record question. Did the district court rule on the argument that Dr. Baden raised about post-indictment delays? You know, I'm not sure that the order actually addressed that specifically. I don't think he ever really raised a post-indictment delay argument. I know he cited Barker v. Wingo, but, you know, to this day I'm not really sure what he's citing that for because, you know, he waived speedy trial I think five different times, you know, and post-indictment there's just no post-indictment delay issue here. But I guess it sounds like you're kind of agreeing. Assuming Dr. Baden raised it and I can't find where the district court ruled on it, you can't help me. That's the bottom line. You hadn't found it either. Is that what I'm hearing? I think that's correct. And I'm sorry, Judge Martin. I don't feel like I can help you with the post-indictment delay argument because, frankly, I continue to not understand what he's trying to get at. And I think, you know, and I'm not sure the district court understood him to be raising a post-indictment delay question. Okay. Thank you. I have nothing else to add unless the court has any questions. And then I'll stand on the briefest of the remaining issues. Nothing further here. Thank you, Ms. McNamara. Thank you. Ms. Howard? Your Honor, this is Tom Brewer. I am having trouble unmuting Ms. Howard. Ms. Howard. I'm sure she has something to say. Oh, brother. As far as you can tell, she is with us. You just can't. Yes, Your Honor, she is with us. I just, the system is not responding to my phone. Should she maybe call back in? Would that work? I know she can hear us. Ms. Howard, would you mind dropping and calling back in? I do apologize. Well, as soon as she says no, she doesn't mind. Your Honor, I did see her drop. I do apologize as soon as she calls back in. This is Linda McNamara. I haven't heard any indication that I'm muted. Am I muted or no?  And I'm going to see if you can hear me. The system will respond. Once we get Ms. Howard back. It's not responding to any of my commands. You're not muted, Ms. McNamara. Okay, thank you. I just wanted to know in case my dog starts barking or something. I've got a construction project right outside my window, so I was a little worried about that. At least I'm still here, right? Hello, this is Katherine Howard on behalf of Appellant Dr. John Hale. May I ask you, Ms. Howard, were you able to hear Ms. McNamara's argument? I was able to hear. And I was able to hear entirely up until I was asked to jump off and jump back on. Okay. All right. Well, that's great news. We're glad to have you back. And sorry for the problem. Oh, no problem. Again, this is Katherine Howard on behalf of Dr. John Gaydon. And I just have a couple of quick points in rebuttal. First, I want to just very briefly touch on the difference between amassed information, as it was sort of described, and individual prescriptions that individual patients might have and why it takes on a different character when this information is amassed. And I think a good analogy can be to Carpenter, in fact. Because there, you know, the court recognized that an individual doesn't have an expectation of privacy, necessarily, to any individual movement out in the world, any discreet journey. Because, of course, people can see it. And at that point, anyone could, you know, call the cops and say, there's that person on the street. But when a program allows sort of a continual, comprehensive tracking of information, that really takes on a different quality. It takes on a different quality as to our physical movements in Carpenter, a quality that deserves protection, in part because it would be really difficult for law enforcement to have gathered that amassed information in the past. And the PDMP allows the same thing. Because, once again, this is not one prescription or a pharmacy's set of prescriptions, but it is a conglomeration, a comprehensive record of Dr. Gaydon's prescribing decisions that are far more revealing as to his practice than they would be if they were disaggregated. Carpenter also makes me think of a second point I wanted to bring up, which is just briefly, you know, the fact that law enforcement has access to the PDMP under the Florida statute is not enough to satisfy the Fourth Amendment. Again, we know this from Carpenter, because, once again, there, there was a statute. It permitted law enforcement to access Carpenter's records. And, in fact, there, there was more protection. I believe they had to show that it was both relevant and material to an investigation. Here, there's really no limiting principle, other than the fact that there is an active investigation. There's not even a, no tethering in terms of the scope of the information that is sought. So, just a mere fact of the statute, you know, it still has to comply with the Fourth Amendment. And because it is permitting an insight into both patients' privacy and doctors' practice in privacy that is previously, was previously unknowable, the Fourth Amendment requires a warrant. And then, just briefly, as to the, to the good faith argument, I do want to point out that, you know, the district court, the good faith argument was that there was a sufficient indicia of probable cause, but in that, it did rely on multiple sources from the PDMP. And I'm not going to go through it all in detail, unless the court would like, but I did just want to correct one, perhaps, misapprehension, which was that the interviews with patients, the district court particularly found were, that the, and Agent Sala testified that she would have done those interviews with patients of the information from the PDMP that she had gained. So, that information, too, would be gone, and we submit that at that point, there simply is not sufficient indicia of probable cause. And finally, I just want to say, of course, the state has an interest in regulating controlled substances and in preventing, you know, drug abuse and drug problems. That is very important, and we're not trying to intrude on that. We're simply saying, you know, that when they want to do it specifically for a criminal investigation, they need to get a warrant. And I would just leave you briefly with this quote from Ferguson v. City of Charleston, that drug abuse both was and is a serious problem, but the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Thank you. Thank you, Ms. Howard, and thank you, Ms. McNamara. It was a well-argued case, and I found the arguments helpful, so we appreciate it. Appreciate it. And we've got the case.